CRESCENT COTTON OIL CO. *v.* STATE EX REL. COLLINS,
ATTORNEY GENERAL.

[83 South. 680, In Banc. No. 20890.]

1. COMMERCE. *Operation of cotton gin as incident to purchase of
cotton seed for interstate shipment not interstate commerce.*

Where a cotton oil mill operated a gin as an incident of its pur-
chase of cotton seed for shipment to its oil mill in another
state, and to enable it to purchase the seed more advantageously,
in such case the ginning was a separate and distinct transaction
from its purchase or shipment and was not interstate commerce
and Laws 1914, chapter 162 (Hemingway's Code, sections 4752-
4756), prohibiting corporations manufacturing cotton seed oil
products from operating cotton gins except in the town where

their cotton oil plant is located, is not invalid as a burden and interference with interstate commerce.

2. MONOPOLIES. *Attempting to destroy competition in cotton ginning by putting down price not unlawful.*

An attempt to destroy competition by putting down the price of ginning cotton below its actual cost does not violate subdivisions (M), (N), or (O), of the anti-trust Laws 1908, chapter 119 (Hemingway's Code, section 3283), as to destroying competition in the manufacturing or sale of commodities.

APPEAL from the chancery court of Sunflower county. HON. E. N. THOMAS, Chancellor.

Suit by the state on the relation of Ross A. Collins, Attorney-General, against the Crescent Cotton Oil Company. From a judgment for relator, defendant appeals. The facts are fully stated in the opinion of the court.

*A. W. Shands,* and *J. B. Harris,* for appellant.

(1) Conceding for the purpose of this argument, that a state has absolute right to exclude a foreign corporation from its borders or to expel it solely upon the ground that it is a foreign corporation, we assume that it will not be questioned at this day, that a state cannot exclude from its borders or expel therefrom and annex conditions or impose any burden either under guise of taxation, license fees, police regulations or otherwise, a corporation engaged strictly in business of interstate commerce. *Pullman Palace Car Company* v. *Kansas* 216 U. S. 68, 54 L. Ed., 386; *Bank of Augusta.* v. *Earle,* 13 Peters, 519, 10 L. Ed. 274; *Pensacola Telegraph Company* v. *Western Union Telegraph Company,* 96 U. S. 1, 24 L. Ed. 708; *Western Union Telegraph Company* v. *Kansas,* 216 U. S. 34, 54 L. Ed. 369; *McCall* v. *California,* 156 U. S. —, 34 L. Ed. 394.

This court, of course, is well aware of the fact that the supreme court of the United State never expressly overrules a case, and its last decision upon any ques-

tion must be taken as the law regardless of the fact, the decision may be in apparent conflict with some former decision, but it must be remembered, however, that the supreme court of the United States deals with facts presented in the case before it, and what may be apparent conflicts are found not to be such when the facts in the particular case are analyzed and understood. There are, however, four recent decisions by the supreme court of the United States which taken together cover every phase of the branch of the case we are now considering, so complete and exhaustive are the decisions in these cases that we do not feel it necessary to burden the court with the great array of cases in which the questions have been repeatedly considered.

We refer to the following cases: *Western Union Telegraph Company* v. *Kansas, supra; Pullman Palace Car Company* v. *Kansas, supra; Ludwig* v. *Western Union Telegraph Company,* 215 U. S. —, 54 L. Ed. 435, and *Harrison* v. *Railroad Company,* 232 U. S. —, 58 L. Ed. 621.

In addition to the propositions already set forth the following propositions are established by the cases last cited.

(A) A burden imposed by a state on interstate commerce is not to be sustained simply because the statute imposing it applies alike to all of the people of all of the states, including the people of the state enacting the statute. *Minn.* v. *Barber,* 136, U. S. 313-319, 34 L. Ed. 455-457; 3rd Inters. Com. Rep. 185; *Robins* v. *Taxing District,* 120 U. S. 489-497, 30 L. Ed. 694-697; 1st Inters. Com. Rep. 45; *Crew Levick Company.* v. *Pennsylvania,* 245 U. S. —, 62 L. Ed. 264.

(B) That a corporation engaged in interstate commerce cannot be deprived of the right to do a local or intrastate business in connection with said commerce as to do so would be to regulate and burden such commerce. The language of the court in the case of the

*Western Union Telegraph Company* v. *Kansas,* 54 L. Ed. 336, is as follows: "But it is said that none of the authorities cited are pertinent to the present case, because the state expressly disclaims any purpose by the statute in question to obstruct or embarrass interstate commerce, but seeks only to prevent the Telegraph Company from entering the fields or domestic business in Kansas without its consent and without conforming with the requirements of its statute, but the disavowal by the state of any purpose to burden interstate commerce cannot exclude the question as to the fact of such a burden being imposed, or as to the unconstitutionality of the statute as shown by its necessary operation upon interstate commerce. If the statute reasoonably interpreted, either directly or by its necessary operation burdens interstate commerce, it must be adjudged to be invalid whatever may have been the purpose for which it was enacted, although the company may do both interstate and local business. This court has repeatedly adjudged that in all such matters the judiciary will not regard mere forms, but will look through the forms to the sustances of things, such is an established rule of constitutional construction, as the adjudged cases abundantly show." The court then proceeds to discuss numerous cases bearing on that point.

The court further said at page 363: "To carry on interstate commerce is not a franchise or privilege granted by the state; it is a right which every citizen of the United States is entitled to exercise under the constitution and laws of the United States; and the accession of mere corporate facilities as a matter of convenience of carrying on their business cannot have the effect of depriving them of such rights, unless Congress should see fit to interpose some legislation on the subject. The rule on this subject is thus laid down in a note to the *Western Union Telegraph Company* v.

*Taggart,* 60 Lawyer's Reporter Annotated at page 691.

If the business is actually a part of interstate commerce and assists in any degree in increasing or aiding in carrying on such commerce, it is beyond the power of the state to tax, citing *McCall* v. *California,* 136 U. S. 47, 35 L. Ed. 649.

The cases of the *Western Union Telegraph Company* v. *Kansas, Pullman Palace Car Company* v. *Kansas,* and *Ludwig* v. *Western Union Telegraph Company,* have been expressly reaffirmed by the supreme court of the United States in the case of the *International Text Book Company* v. *Pigg,* 217 U. S. —, 54 L. Ed. 687; *Railroad Company* v. *Conner,* 223 U. S. —, 56 L. Ed. 438; *Looney* v. *Crain Company,* 245 U. S. —, 62 L. Ed. 335.

In the case of the *International Text Book Company* v. *Pigg,* 217 U. S. —, 54 L. Ed. 687, the court said: "It is the established doctrine of this court that a state may not in any form or under any guise directly burden the prosecution of interstate commerce." This language was used in respect to the operation of the statute upon local matters.

Of course, it necessarily follows from the authorities which we have cited above and which are the last utterances of the supreme court of the United States on the subject, if the state could not impose a tax upon a local business carried on in connection with an interstate commerce, and make the payment of the tax or the filing of the statements a condition to the carrying on of the local business, manifestly the legislature could not under any guise or in any way prevent the carrying on of the local business thus related to and necessary to or in aid of the carrying on of interstate commerce.

(C) "That the police powers reserved to the state are such as incidentally affect interstate commerce and as such are established for the protection, safety and convenience of the people, and are not in themselves in any

just sense, an obstruction to, or in conflict with the substantial rights of those engaged in interstate commerce, but are referable to the police powers of the state and to be respected until Congress covers the subject by legislation." *Western Union Telegraph Company* v. *Kansas,* 54 L. Ed. 365. This view as to the restricted meaning of the police power as reserved to the state is fully supported in the cases of: *Chicago* v. *Sturgis,* 222 U. S. 113, 56, L. Ed. 215; *Lemieux* v. *Young,* 211 U. S. 489, 53 L. Ed. 285; *Cincinnati R. R. Co.* v. *Connersville,* 218 U. S. 336, 53 L. E. 1060; *Mutual Loan Company* v. *Martel,* 222 U. S. 225, 56 L. Ed. 175; *Austin* v. *Tennessee.* Speaking on the subject the court said: *Kidd* v. *Pearson,* 128 U. S. 120, 32 L. Ed. 345; *Salvage* v. *Jones,* 225 U. S. 501, 56 L. Ed. 1182; *Stockfood Company* v. *Wright,* 225 U. S. 540, 56 L. Ed. 1182; *Railroad Company* v. *Wharton,* 207 U. S. 328, 52 L. Ed. 230; *Express Company* v. *Commonwealth,* 214 U. S. 218, 53 L. Ed. 972; *Railroad Company* v. *Husen,* 95 U. S. 465, 24 L. Ed. 527.

Bearing on the question before this court it is settled that the supreme court of the United States is not concluded by a state's interpretation of its statute in matters involving constitutional protection, but will decide the question for itself. *Crew Levick Company* v. *Pennsylvania,* 245 U. S. 292, 62 L. Ed. 295; *St. Louis Railroad Company* v. *Arkansas,* 235 U. S. 363, 59 L. Ed. 271, and cases cited; also, *American Mfg. Company* v. *St. Louis,* advance sheets August 15, 1919, page 651. The power exerted is the test and not the reason given for its exercise. *Pullman Palace Car Company* v. *Kansas,* 216 U. S. 70, 54 L. Ed. 387; *Looney* v. *Crain Company,* 245 U. S. —, 62 L. Ed. 235; *Looney* v. *Crain Company, supra,* 62 L. Ed. 236. The decisions which we have reviewed and referred to above settle conclusively the following propositions as bearing on the case at bar.

I.   That a state cannot exclude or expel a foreign corporation engaged in interstate commerce.

2.   That a state cannot either directly or indirectly under the guise of police power or otherwise regulate or burden interstate commerce.

3.   That protection from state regulation is not confined to the matter of transportation or movement of commodities in interstate commerce; but extends to all those instrumentalities, corporate, conveniences, or facilities which assist in the carrying on or aiding such commerce.

4. That to deprive a corporation of the right to carry on a local business which is directly connected, and assists in any degree in increasing and aiding in the carrying on of such commerce is beyond the power of the state to control, because to deprive of this right would be to burden interstate commerce.

5.   That a state statute cannot be upheld by the decision of the state court, or by a construction of a state court, that the statute is only intended to apply to local or intrastate business, but the validity of the statute under the Federal Constitution shal be determined by the Supreme Court of the United States upon its own judgment of the operation and effect of the statute irrespective of the form which it presents, or how it is characterized by the state court, the power exerted is the test and not the reason given for the exercise.

6. That the statute bears by its terms upon all persons and corporations in the state alike, will not sustain the statute if in its application to a particular corporation or person, it imposes either a direct or an indirect burden upon the interstate commerce and in the particular instance regulates it in effect.

This court must hold that the Act of 1914, chapter 164, either applies to corporations engaged in interstate commerce or that it does not apply to such. If it does not apply to corporations engaged in interstate com-

merce, then of course the decree of the court below should be reversed because the appellant was engaged in interstate commerce to wit, the procuring of cotton seed was for interstate shipment exclusively.

If the court should say that the statute was only intended to and could only apply to and affect the local business or intrastate business and that operating a gin for the purpose of procuring cotton seed was local business, the statute cannot be applied to the appellant, and the decree must be reversed, because the only local business, if any done by the appellant, that is to say, the operation of the gin, was necessarily adjunct to its interstate commerce and was used exclusively in reference to such commerce for the purpose of aiding in said commerce only.

As to the effect of such a holding upon the statute we invited the court's attention to the case of the *Pullman Car Company* v. *Kansas, Western Union Telegraph Company* v. *Kansas, Luding* v. *Western Union Telegraph Company, International Text Book Company* v. *Pigg,* all reported in 54 L. Ed. and cited above.

This is not a statute partly constitutional and partly unconstitutional, so that its provisions can be separated and the constitutional part stand and the unconstitutional part fall, because the application of the statute to the appellant necessarily burdens its interstate commerce. To deprive it of the right to operate a gin in connection with its interstate commerce would be practically to destroy this business, whether the operation of the gin be treated as local or interstate business and the statute as to that must fall as to the appellant. The decree of the court below cannot be upheld upon any ground.

It was insisted by the attorney-general upon the argument on the application of a writ of *supersedeas,* that manufacturing is not commerce and that ginning is manufacturing. In fact the supreme court of the United

States has held in the case of *Kidd* v. *Pearson*, 138 U. S. 120, 32 L. Ed. 346: "That manufacturing was not commerce, and that the fact that the manufacturer might have some intention at some time to ship the products from his factory out of the state in interstate commerce would not relieve him from the operation of the statute prohibiting the manufacture and sale of intoxicating liquor in the state."

The manufacturer in that case was not engaged in interstate commerce and by reading the case the court will see that his interstate commerce was merely a mental condition and not an actual condition. A mere desire to do an interstate business is not enough. 52 L. Ed. 828.

In the case at bar the appellant was engaged in an interstate business strictly, its whole purpose in coming into the state of Mississippi was to carry on an interstate business. It was actually engaged in that business at the time the Act of 1914 was passed and had been a long time prior to that time. Under the changed conditions it became necessary in order to acquire cotton seed for its mill in Tennessee that he should operate a gin, it was operating for that reason two gins in Mississippi and some gins in other states. It was shown conclusively that he had to either operate a gin or put himself at the mercy of the gin monopoly, in order to get cotton seed to ship to his mill in Tennessee. The gin was merely a feeder to the oil mill, a necessary adjunct to the interstate commerce business of supplying his oil mill with cotton seed, but while we might concede that ginning is not commerce, it may become a very essential part of the commerce or instrumentality of commerce both local and interstate.

The question is not whether ginning is or is not commerce *per se,* but the question is, whether the operation of the gin was so related to the intersetate commerce as to aid in increasing and facilitating that

business. The question is not whether the appellant might have been able to buy cotton seed or obtain cotton seed by some other method more expensive or burdensome. Under the testimony of this case, it is shown without dispute that it could obtain cotton seed more economically and more certainly and maintain its business more efficiently by the operation of the gin. The operation of gins having become the principal means of obtaining cotton seed its interstate business could not be otherwise sucessfully carried on.

The decree, as the court will see, forfeits the right of the appellant to do business in the state of Mississippi (following the language of the statute), and from operating a gin in the state of Mississippi that is the first part of the decree. In the subsequent paragraph of the decree the appellant is perpetually enjoined from doing any local or intrastate business in the state of Mississippi. The court cannot forfeit its right to do interstate business in the state of Mississippi, and therefore the decree of the court must be reversed on that ground, and under the authorities which are set forth above, it cannot be deprived of the right to do a local business in the state of Mississippi if that business is entirely related to and in connection with it and in aid of its interstate business and necessary to properly carry it on. To say that to deprive the appellant of the right to operate a gin in Mississippi upon the facts disclosed in this record would not be directly burdening its interstate commerce; it seems to us, that the language of an eminent state judge, would be "to cut the throat of reason, and knock out the brains of common sense."

There is no ground upon which the statute can be supported. It cannot be supported upon the ground that ginning is in any way inimical to the public health or comfort; on the other hand, ginning is recognized as a perfectly legitimate business. It certainly cannot be

urged that an interest in an oil mill, or the operation
of an oil mill is in any way inimical to the public welfare,
so the statute cannot be supported as a police regula-
tion under the numerous decisions of the Federal court
which we have cited above, if that regulation in any
way impedes or burdens or restricts interstate com-
merce.

*Ross A. Collins* and *Frank Roberson,* for appellee.

The bill filed by the state on the relation of the at-
torney-general is dual in phase. The first phase is
that the Crescent Cotton Oil Company is operating gins
in Mississippi in violation of chapter 162, of the Laws
of 1914; the second phase is, that the defendant had
no charter power to operate a gin. The prayer is
for both special and general relief. The court is
asked first to penalize the defendant by fine and ex-
clusion from the state of Mississippi.

The answer of the defendant in the lower court, ap-
pellee, here, is threefold: First: That the Act is
void because the company had invested in property in
this state prior to the passage of the statute and to
prevent the use of this property by the defendant would
be to deprive the defendant ot its property without
due process of law; Second; that the Act denies the
defendant the equal protection of the laws guaranteed
by the constitution of Mississippi and of the United
States in that a corporation engaged in the oil mill or
compress business cannot own or operate a gin, while
an individual engaged in the same business is only
denied the right to become interested in a corporation
gin; Third: The defendant denies that its charter does
not confer upon it the right to operate gins.

POWERS OF STATE TO EXCLUDE OR EXPEL CORPORATIONS.
I understand the argument of counsel for appellee
on the right of Mississippi to exclude foreign corpora-

tions to be, first that the right to exclude a foreign corporation which has filed its charter with the secretary of state under section 735 of the Code of 1906, and has made investments in property within the state, cannot be done under the reservation made in section 178 of the Constitution, and further it would not be a valid exercise of the police power; second, that where the act providing for the exclusion of the foreign corporations and individuals, such an act is discriminatory and is violative of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

The power to regulate public gins is the putting into effect the public policy of this state as to oil mills, compress and gins. Section 914 of the Code under which the appellee does business in Mississippi specifically provides: "but such foreign corporations shall not do or commit any act in this state contrary to the laws or policy thereto." It is elementary that the public policy of any state is in a constant condition of change. Innumerable instances of changes in public policy will occur to the court. It necessarily follows, therefore, when the Crescent Cotton Oil Company entered Mississippi that it was charged with notice that the public policy of the state as it then existed, and as it might be in the future, would have to be taken into consideration when it came in and be obeyed thereafter. Furthermore, section 178, of the constitution of Mississippi, which evidences one of the great changes in the public policy of this state, provides the legislature shall have power to alter, amend or repeal any charter of incorporation now existing and revocable, and any that may hereafter be created whenever in its opinion it may be for the public interest to do so. Provided, however, that no injustice shall be done to the stockholders."

The power necessarily exists to exclude a foreign corporation doing business within this state, which has

made investments in property prior to the passage of the statute changing the public policy. If the state were impotent to exclude the foreign corporation having acquired property rights prior to the passage of the act, it might be successfully argued that section 178 of the Constitution would be contrary to the equal protection clause of the Fourteenth Amendment to the Constitution of the United States, in that a domestic corporation could have its charter repealed by the state while a foreign corporation doing the same business as a domestic corporation could not be excluded according to the appellee's contention, because it had acquired vested property rights within the state. This is the effect of the contention of appellee when the contention is transferred from a foreign corporation doing business within the state, to a domestic corporation.

Statement of Abstract Legal Principles Pertaining to Corporations and Federal Constitution.

For purposes of convenience, I desire, at this point, to set forth certain abstract principles of law without citing the authorites upholding the same, which will later be given in this brief.

A corporation is not a citizen within the meaning of the Fourteenth Amendment, prohibiting the states from making or enforcing any law abridging the privileges or immunities of citizens of the United States. A corporation is a person under the Fourteenth Amendment, giving all persons equal protection of the laws. A corporation is a person within the meaning of the process clause of the Federal constitution.

The Act Does Not Violate the Due Process Clause of Constitution of United States.

Leading cases, *supra,* are *United States* v. *Lake Shore & M. S. Ry. Co. et al.,* 203 Fed. 295; *United States* v. *Delaware & Hudson Company,* 1909, 213 U. S. 366, 53 L. Ed. 836; *Del. L. & W. R. Co.* v. *United States,* 231

U. S. 363, 58 L. Ed. 269; *Lemieux* v. *Young,* 211 U. S. 491, 53 L. Ed. 295.

Does Not Contravene Equal Protection Clause of the Fourteenth Amendment.

The court will be very careful to notice the cases the statute under review does not discriminate as between foreign and domestic corporations cannot be applicable to the statute under review, for the reason that the statute under review does not discriminate as between foreign and domestic corporations; the same penalty in effect is imposed on each. The foreign corporation is excluded, whereas the charter of the domestic corporation is repealed and forfeited. This is the sole method by which equal penalties could be imposed since the domestic corporation cannot be excluded, but the charter must be revoked or forfeited, so, the contention as to discrimination in the statutes between foreign and domestic corporations is without merit, since the situation complained of does not exist in the state.

The question of discrimination cannot be considered in this case for the reason it pertains solely to the question of the power of the state to prevent an oil mill or compress corporation from doing a ginning business. The question as to the equal protection of the law can only arise with reference to concerns which have the right to do a given line of business in the state; but if the question of discrimination between corporations and individuals is to be considered, we shall discuss this phase more fully hereafter. *State* v. *Louisville & Nashville R. R.,* 97 Miss. 35, 51 So. 918; *Harrison* v. *St. Louis & S. F. R. R. Co.,* 232 U. S. 318, 58 L. Ed. 261.

Councel for appellee also refers to the case of *Herndon* v. *Chicago & Rock Island R. R. Co.,* 218 U. S. 135, 54 L. Ed. 980. In that case, the court was dealing with two statutes of Missouri, one requiring all passenger

trains to stop at all junction points a sufficient length of time for passengers to disembark; and the other, to revoke the right to do business within the state of any corporation attempting to remove a case to the Federal court. The carrier made two contentions which were, that the first statute was an interference with interstate commerce and contrary to the commerce clause; that the second statute was an interference with judicial power of the United States.

There is nothing in this case that even intimates that a foreign corporation, not engaged in the business of carrying interstate commerce, but engaged in intrastate business, might not be expelled by a statute that allowed a reasonable time to dispose of the property, even though the property had been already acquired; when at the same time a domestic corporation doing the same prohibited act as the foreign corporation would incur in effect the same penalty; and this, too in a state which has a constitutional provision providing for the repeal, alteration or amendment of the charter of any domestic corporation where no injustice is done to the stockholders.

The distinction between the case cited by appellee and the one before this court is clear and distinct. No question of the commerce clause is involved; no atempt to interfere with the judicial power of the United States is made; no equal protection of the laws as between persons similarly situated is denied; no unreasonable or arbitrary classification is made in the statute.

Appellee's brief cites the case of *Southern Railway Company* v. *Greene,* 216 U. S. 400, 54 L. Ed. 536, and makes copious quotations therefrom. The state of Alabama attempted to impose an additional franchise tax on foreign corporations doing business in that state, which statute did not apply to domestic corporations engaged in the same business.

This case, it will be seen, deals with corporations having the right to do business in Alabama, and that are carrying on their business in compliance with the laws of that state, while the case at bar deals with corporations that are prohibited from doing a certain character of business here; so, the question of equal protection of the law cannot be applicable because the corporation cannot be said to be lawfully doing business in Mississippi. This conclusion cannot be diputed successfully by appellees, for the reason that counsel for appellee admit in their brief that the regulation of ginning is a proper subject for the exercise of the police power of the state.

The court in the *Alabama case, supra,* on page 539 of 54 L. Ed. said: ''The important Federal question for our determination in this case is: When a corporation of another state has come into the taxing state, in compliance with its laws, and has therein acquired property of a fixed and permanent nature upon which it has paid all taxes levied by the state, is liable to a new and additional franchise tax for the privilege of doing business in the state of the same character as that in which the foreign corporation is itself engaged?''

The equal protection of the laws means subject to equal laws, applying alike to all in the same situation. If the plaintiff is a person within the jurisdiction of the state of Alabama, within the meaning of the Fourteenth Amendment, it is entitled to stand before the law upon equal terms, to enjoy the same rights as belong to, and to bear the same burden as are imposed upon other persons in alike situation. *Western Union Telegraph Company* v. *Kansas,* 216 U. S. 1, 54 L. Ed. 355, was a case strongly relied upon to declare invalid our anti-removal statute; but in this case, the court said, on page 368: ''But it is said to be well settled that a state, in the exercise of its reserved powers, may prescribe the terms on which a foreign

corporation, whatever the nature of its business, may enter and do business within its limits.

"It is true, that, in many cases, the general rule has been laid down that a state may, if it chooses or imposes such terms and conditions on their doing business in the state as in their judgment, may be consistent with the interests of the people. But those were cases in which the particular foreign corporation before the court was engaged in ordinary business, is not directly or regularly in interstate or foreign commerce."

A corporation is not a citizen within the Constitution of the United States, article 4, section 2, clause 1, declaring that the citizens of each state shall be entitled to all the priviliges and immunities of the several states, nor the Fourteenth Amendment to the said constitution prohibiting the state from making or enforcing, any law abridging the privileges or immunities of citizens of the United States. *State* v. *L. & N. R. R. Co.*, 97 Miss. 35; *Berea College* v. *Ky.*, 211 U. S. 45, 53 L. Ed. 81; *Western Turf, Assoc'n* v. *Greenberg*, 204 U. S. 359, 51 L. Ed. 520; *Selover Bates & Co.* v. *Walsh*, 226 U. S. 112, 57 L. Ed. 146; *Pembina Gilver Mining Co.* v. *Penn*, 125 U. S. 181, 31 L. Ed. 650.

The legislature has a wide discretion in making classifications for legslative purposes. *Huggins* v. *Home Fire Ins. Co.*, 107 Miss. 650, 65 So. 646.

The classification of persons or property must be based on some reasonable ground and some rule different from mere arbitrary selection, and discriminations against persons and classes of unusual character are unconstitutional. *Adams* v. *Standard Oil Co. of Ky.*, 97 Miss. 879, 53 So. 692.

This decision expressly recognizes that corporations and persons may have different classifications as a matter of right and will be discussed more fully hereafter; therefore, there is no denial to appellee of the equal protection of law as against indiviluals. The con-

stitutional ground of equal protection of the laws means subject to equal laws applicable to all in the same situation. *Adams* v. *Standard Oil Co. of Ky., supra*; *Gulf, etc., R. Co.* v. *Ellis,* 115 U. S. 150, The exemption of designated persons from the operation of statutes does not deprive persons of the equal protection of the laws, *Minn. Iron Co.* v. *Kline,* 199 U. S. 593, 50 L. Ed. 322.

That persons engaged in the same line of business are classified and different provisions are applied to each class, does not deprive them of the equal protection of the law. *St. John* v. *N. Y.,* 201 U. S. 633, 50 L. Ed. 896; *U. S.* v. *Kruikshanks,* 92 U. S. 542, 23 L. Ed. 588.

The case of *Ballard* v. *Oil Company,* 81 Miss. 506, is relied on by the appellee as authority for the invalidity of the Act of 1914 under review. It is contended that this case held a statute unconstitutional because it discriminated between corporations and individuals. We do not agree that this was the ground on which this case was decided. In our opinion, that statute was held to be unconstitutional because it applied to all corporations as against individuals, and the opinion of the court was that the statute was unconstitutional because the classification of all corporations was arbitrary, and that the classification should have been limited to railroads and corporations in a similarly hazardous business. It was on the ground of unequal protection, not withdrawing charter power.

Our own supreme court has always distinguished subsequent cases from the Ballard case, our own courts have never placed the same construction upon this decision as is contended for by appellee. In the Ballard case, the court did not have under consideration the power of the railway company to do railway business within the state. The exact question involved in our case is the power of the legislature to prohibit a corporation from doing a certain particular business within

the police power.   The question of the equal protection of the law arose in the Ballard case because the railway company had the power to do the particular business, but in this case the power is the thing that is exercised by the legislature and the equal protection of the law.   Defense does not and cannot arise until the corporation has the power to do the particular act.   So it follows that the Ballard case is not in point even if it be correctly decided, and it must be admitted that the Ballard case now stands single and alone, all the other courts, including the supreme court of the United States, have held that it is proper to make rules with reference to corporations not applicable to individuals.

In *Adams, State Revenue Agent*, v. *Standard Oil Company, of Kentucky,* 97 Miss. 879, 53 So. 692, our supreme court cited the Ballard case, and held that a classification between the Standard Oil Company in peddling, and the aged and inpecunious and physically disabled from paying a peddler's license is based on existing conditions founded on reason and justice, and is not violative of the equality clause of the Federal Constitution.   This case was a clear distinction between a corporation and an individual each of whom was doing a peddling business, but the court held that the classification and discrimination was not unreasonable and arbitrary, but was valid.   The court said that the Ballard case was not authority against such a discrimination, but that that case only decided that the classification must be reasonable and not arbitrary.

The supreme court of the United States has held since the decision in the Ballard case, that a reasonable classification as between corporations and individuals was not invalid and contrary to the equal protection of the last clause of the Fourteenth Amendment.

Corporations may be governed by laws that do not apply to or affect the rights of individuals. *Hammond Packing Company* v. *Arkansas,* 212 U. S. 322, 53 L.

Ed. 530; *Standard Oil Co.* v *.Tenn.*, 217 U. S. 413, 54
L. Ed. 817; 2 Watson on the Constitution page 1211,
et seq.; *State* v. *Rickeek* (Ind.), 77 1085, 5 L. R.
A. (N. S.) 874.

PROPERTY ACQUIRED PRIOR TO PASSAGE OF ACT DOES NOT
DEPRIVE THE STATE OF ITS POWER TO REGULATE AND
EXCLUDE UNDER POLICE POWER OF THE STATE.

It seems to be argued by counsel for appellee, on page
10 of his brief, that the power of a state to expel a
foreign corporation cannot be exercised where the busi-
ness conducted is lawful at the time of the entrance into
the state and is not violative of the public policy at
that time. This contention, followed to its natural con-
clusion, would mean utter stagnation in the business
of any state, since the right to control foreign corpora-
tions would be limited by the public policy as existing
at the time of its entrance into the state. The logical
sequence of such a condition would be that the state
could not then control domestic corporations under a
progressive and changing public policy for the reason
that a domestic corporation would then be discriminated
against in favor of a foreign corporation. When the
Cresent Cotton Oil Company came into Mississippi,
it came with the knowledge that is must be governed by
the public policy of a state; must be as fixed as the
laws of the Medes and Persians. But the legislature
cannot by any grant or franchise deprive itself of the
power of making any needful police regulations, the
police power being inalienable even by express grant.
*Charleston* v. *Goldsmith,* 2 Speers (S. C.) 428; *New*
*Orleans Gas Light Co.* v. *La. Light, etc., Co.,* 29 L. Ed.
516; *Boston Beer Co.* v. *Mass.,* 24 L. Ed. 989; *Mich.*
*Tel. Co.* v. *Charlotte,* 93 Fed. 11; *Esconaba Company*
v. *Chicago,* 107 U. S. 678, 27 L. Ed. 442; *Brown*
v. *Keener,* 74 N. C. 714; *Pool* v. *Teexler,* 76 N. C.
297; *Hadecheck* v. *Sebastian,* 239 U. S. 394, 60 L.

Ed. 348; *Pembina Consolidated Silver Mining Co.* v. *Penn.,* 125 U. S. 181, 31 L. Ed. 650.

LEGISLATURE HAS RIGHT TO ALTER, AMEND, OR REPEAL A CHARTER UNDER SECTION 178 OF MISSISSIPPI CONSTITUTION.

*Citizens Saving Bank* v. *Owensboro,* 173 U. S. 636, 644, 43 L. Ed. 840, 843, 19 Sup. Ct. Rep. 530, 571; *Barbier* v. *Connolly,* 113 U. S. 27, 28 L. Ed. 723; *Hammond Packing Co.* v. *Arkansas,* 212 U. S. 322, 53 L. Ed. 530; *Fire Association of Philadelphia* v. *New York,* 119 U. S. 110, 30 Law Ed. 342. A foreign corporation has no absolute right of recognition and may be regulated in such state, both as to its admission and its conduct. *Southern Bldg. & Loan Ass'n* v. *Norman,* 98 Ky. 304, 56 Am. St. Rep. 373, 32 S. W. 954, 31 L. R. A. 43; *Paul* v. *Virginia,* 8 Wall. 168, 19 L. Ed. 357, on page 360; *Munn* v. *Illinois,* 94 U. S. 113, 24 L. Ed. 86.

DISCRIMINATION BETWEEN INDIVIDUALS CANNOT BE RAISED IN THIS PROCEEDING.

Counsel in his brief for the appellee argues that the statute is unconstitutional because it discriminates between individuals. No such defense is made in the answer. The answer limits the discrimination between corporations and individuals and says nothing about a discrimination as between individual and individual.

It is no concern of the appellee in this case as to whether there is a discrimination between individuals or not, since it is not an individual. *Hammond Packing Co.* v. *Arkansas, supra.*

METHOD OF EXPULSION NOT LIMITED TO QUO WARRANTO PROCEEDINGS.

It is argued by appellee that the state is endeavoring to use a mistaken remedy by filing a bill in chancery to forfeit the right of the appellee to do business in this state and to expel it from the state. It is

insisted that the remedy is by *quo warranto* under section 4017, of the Code of 1906.

We think it a sufficient answer to say that the writ of *quo warranto* is not exclusive but that chapter 162, Laws of 1914, is another, different and concurrent remedy. Both remedies exist at the same time; one is in a court of law and the other in a court of equity.

We submit, therefore, that the statute does not arbitrarily classify corporations and individuals is reasonable and based on actual conditions of which the legislature had knowledge; that the statute does not deprive the appellee of its property without due process of law as used in the constitution, nor is it denied the equal protection of the laws; and that the very life of small independent oil mills and privately owned gins depends on the validity of this statute being upheld.

It is elementary that if the court is doubtful about the constitutionality of the statute, the doubt should be resolved in favor of the constitutionality and every enactment of the legislature is presumed to be constitutional. *Pensacola Electric Co.* v. *Doderland,* 53 So. 772. If the appellee is dissatisfied with the purpose of this statute, its remedy is at the polls and not in the courts.

SYKES, J., delivered the opinion of the court.

This is the second appearance of this case in this court. Upon the former appeal we held that chapter 162 of the Laws of 1914 (section 4750 et seq., Hemingway's Code), was constitutional. This case is reported in 116 Miss. 398, 77 So. 185, and reference is here made to that report for a more complete history of the case. Upon the remand of the case to the chancery court the oil company upon motion was allowed to make the following amendment to its answer:

"Respondent, Crescent Cotton Oil Company, would show that it is engaged, and had been for a long time prior to the passage of the act of 1914, mentioned in the said bill, engaged, in the operation of a cotton oil mill in the state of Tennessee, and in order to procure seed to run the said oil mill was during all of said time engaged in the buying of cotton seed in the state of Mississippi, and that all seed bought in the state of Mississippi were shipped in interstate commerce from the state of Mississippi into the state of Tennessee.

"This respondent would further show that conditions arose which rendered it impossible for a person not operating a gin to compete sucessfully with a person owning a gin in the purchase of cotton seed.

"Respondents would show that in order to stay in the market and continue to buy seed at Rulevlle, to be so shipped in such interstate commerce, it was necessary for it to acquire and operate a gin plant, which it did in 1910, and has continuously operated same since that time, and that the ownership and operation of said gin was a means and instrumentality made use of by this respondent in carrying on its business of cotton seed buyer and interstate shipper of cotton seed, and that the operation of said gin was an incident to the business of cotton seed buyer, and was a necessary and essential incident.

"Respondent would further show that to deprive it of the right to own and operate its gin plant will greatly burden and destroy its business of interstate commerce, in the shipment of cotton seed from the state of Mississippi into the state of Tennessee, and would be in conflict with the commerce clause of the Constitution of the United States, being subdivision 3 art. 1, section 8.  Respondent would further show that it is now engaged in no business in the state of Mississippi, and was not at the time of the passage of this act or the filing of this suit, or at any time prior thereto, except

such as is necessary to acquire cotton seed and ship them in interstate commerce and incident to such business of interstate shipper of cotton seed.''

The testimony in the case for the complainant showed that at various and sundry times when the other cotton gins at Ruleville would not agree to sell to the defendant oil mill a certain amount of seed bought by them, the defendant would put down the price of ginning below its actual cost, for the purpose of destroying competition in ginning. The testimony also showed that the ginner has a great advantage in the buying of cotton seed over one who doesn't operate a gin; that at Ruleville it is almost the invariable custom of the cotton owner who wishes to sell his seed to sell it to the one who does his ginning. From the testimony it appears that the ginning business of the appellant company at Ruleville is operated in this manner. The owner of the cotton in the seed brings his cotton to the gin, and if he wishes to sell the seed to the gin the cotton is then ginned, and the seed blown into the seed house of the defendant. The lint cotton is then baled and gotten by its owner. It seems from this testimony that the defendant company actually negotiated for the purchase of the seed before the cotton was ginned. If the owner of the cotton does not sell his seed to the gin the seed are not blown into the seed house of the gin, but are reloaded on the wagon of the owner. The record does not show what proportion of the seed of cotton ginned by the defendant company is thus purchased by it. One who operates a cotton gin is thereby enabled to buy a larger quantity of seed, and at a more reasonable price than he would did he not operate a gin. In other words, the advantages in operating a gin are that the ginner is thereby given a better opportunity to buy seed from the person who gins with him, and also probably at a lower price, than if he did not own and operate the gin. The manager of the defendant

oil company testified that in order for him to buy as
much seed as he needed in his own mill business and
at an advantageous price, it was necessary for him to
operate cotton gins.  He also testified that his mill
operated eleven different cotton gins, two being in
Mississippi, and the others probably in Arkansas and
Tennessee.  The testimony for the complainant in the
case further shows that the seed bought by the other
gins at Ruleville were sold to other oil mills.  That it
was usually customary for them to make arrange-
ments with some oil mill to sell the seed bought by
them to these mills for a certain profit.  The testimony
for the defendant also shows that it made money from
its ginning operations at Ruleville.  From all the testi-
mony in the case, we think it proves that an oil mill in
operating a gin is enabled thereby to purchase a larger
volume of cotton seed at a lower price than is pos-
sible by being forced to go into the open market for
for cotton seed, or having to buy these seed from other
gins.

The uncontradicted testimony in the case shows that
all of the seed bought by the defendant company from its
ginning customers were bought for the purpose of ship-
ment, and were actually shipped to its oil mill in
Memphis, Tenn.  To use the phrase of the general
manager of the defendant company, this gin was used
as a feeder for its oil mill in Memphis, Tenn., mean-
ing that its principal object and purpose in running the
gin was to enable it advantageously to purchase these
seed from its customers for shipment to its oil mill in
Memphis.

The decree of the chancery court found that the Cres-
cent Cotton Oil Company was guilty of violating the
above law, and also of violating the anti-trust statute.
Chapter 119, Laws of 1908 (section 3283, Hemingway's
Code).  The oil company in this decree is perpetually
enjoined from operating a cotton gin in Mississippi,

and was given ninety days within which to dispose of its two gins in this state, in default of which a receiver is to take charge of these gins and sell them at public auction to the highest bidder, in thirty days. The defendant oil company is also perpetually enjoined from doing an intrastate business in the state of Mississippi, and is enjoined from violating the anti-trust law. For the violation of chapter 162 of the laws of 1914 (sections 4752-4756, Hemingway's Code), the defendant company was fined one thousand nine hundred dollars, and for a violation of the anti-trust law it was fined one hundred dollars. The decree also provides that the defendant oil company shall forfeit its right to do business in the state of Mississippi. From this decree this appeal was prosecuted.

It is the contention of the appellant, and ably presented in brief and oral argument, that the question now before the court is different from that on former appeal; that the testimony here shows that the defendant oil company was engaged in interstate commerce, namely, in shipping cotton seed from Mississippi to its oil mill in Tennessee; that as an incident to this interstate commerce and in order to obtain what seed it needed at a reasonable price, it was necessary for it to operate the two cotton gins in Mississippi; that the operation of these two gins is but an incident of its interstate commerce business, namely, that of shipping cotton seed from Mississippi to Tennessee; therefore, that it is a burden on, and an interference with, interstate commerce to prohibit this mill under these circumstances from operating gins in Mississippi; that the gin is but an incident, and not the dominant object or business of the defendant company; that in this case the interstate commerce is the paramount and dominant business, and the operation of the gin a mere incident in aiding and assisting the carrying on of the interstate business. To sustain this contention the learned counsel for ap-

pellant rely upon the cases of *Pullman Palace Car Co.*
v. *Kansas,* 216 U. S. 65, 30 Sup. Ct. 232, .54 L. Ed. 385;
*Western Union Tel. Co.* v. *Kansas,* 216 U. S. 1, 30
Sup. Ct. 190, 54 L. Ed. 355; *Ludwig* v. *Western Union*
*Tel. Co.,* 216 U. S. 146, 30 Sup. Ct. 280, 54 L. Ed. 423;
*Harrison* v. *Railroad Co.,* 232 U. S. 318, 34 Sup. Ct. 333,
58 L. Ed. 621, L. R. A. 1915F, 1187.

In the first two cases above cited the statute of the
state of Kansas was involved, which attempted to tax
as a charter fee a given per cent. of the entire author-
ized capital stock of a foreign corporation as a condi-
tion of its continuing to ·do a local business in the
state. This was held to be a burden and a tax on the
company's interstate business and on its property lo-
cated or used outside of the state. The Ludwig case
is quite similar, involving a statute of the state of
Arkansas.

The Harrison case holds that the right of a foreign
interstate railway company to · remove a case to the
federal court under proper circumstances cannot be
prohibited by a state statute.

None of the points actually decided in any of these
cases is authority or applicable to the point before the
court. The question of what is or what is not a burden
on, or an interference with, interstate. commerce is
ably discussed in these opinions, especially in the case
of *Western Union Tel. Co.* v. *Kansas, supra.*. In that
case Mr. Justice Harlan reviews at length the decisions
of the supreme court of the United States bearing upon
this question. It is to be noted, ' however, that every
case above cited is one in which the principal business
of the corporation was interstate business, though these
corporations also did an intrastate business. In the
case at bar it is admitted by counsel for appellant that
the ginning of cotton is not interstate commerce. This
is undoubtedly true under all of the authorities. But
counsel contends that the ginning and the interstate

commerce are so interwoven and intermingled that they
are inseparably connected in this case because of the
fact that appellant was engaged in interstate commerce
in shipping the cotton seed from Mississippil to Tennes-
see. In this case, however, after a price had been
agreed upon for the cotton seed, and the seed thereby
sold to the defendant company, it was necessary for
the seed to be separated from the cotton by the process
of ginning. In this ginning process the seed of the
appellant were blown into his seed house. After which
time, either immediately or at a later date, the seed
were shipped by appellant in interstate commerce from
Mississippi to Tennessee.' The buying of the cotton
seed was not interstate commerce, the ginning of the
cotton was not interstate commerce, and it only became
interstate commerce after it had been tendered to and
accepted by the interstate carrier for transportation
from Mississippi to Tennessee. It makes no difference
what the purpose of the appellant company was in
erecting and operating its ginning plants at these two
points in Mississippi. By their operation it was doing
what is well recognized as a business, namely, the gin-
ning of cotton within the state of Mississippi. It is
well settled by all of the authorities that the state has
a right to regulate its internal affairs, and a ginning
plant operated in Mississippi is of this classification.
In one sense of the word, ginning is manufacturing seed
cotton into lint cotton and cotton seed.

The purchase of the cotton seed is a separate and
distinct transaction from the ginning of the seed, and
the ginning of the seed is a separate and distinct trans-
action from the shipping of these seed from Mississippi
to Tennessee. In other words, before these seed become
a part of interstate commerce, or before this defendant
company becomes engaged in interstate commerce in
this transaction, it has to do three things; namely,
purchase the seed, gin the cotton, and then deliver

these seed to a carrier for interstate shipment. The fact that the defendant company had purchased the seed from the owner before the ginning of the cotton, and was the owner of the seed at the time of the ginning, and intended at some future time to ship these seed from Mississippi to Tennessee, does not make the ginning of this cotton interstate commerce.

In the case of *Kidd* v. *Pearson*, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346, the supreme court of the united States through Mr. Justice LAMAR, in holding a law of the state of Iowa, authorizing the abating as a nuisance of a distillery used for the unlawful manufacture and sale of intoxicating liquors, not unconstitutional as an attempted regulation of interstate commerce, in part says:

"We think the construction contended for by plaintiff in error would extend, the words of the grant to Congress, in the Constitution, beyond their obvious import, and is inconsistent with its objects and scope. The language of the grant is: Congress shall have power to regulate commerce with foreign nations and among the several states,' etc. These words are used without any veiled or obscure signification. 'As men whose intentions require no concealment generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense and to have intended what they have said.' *Gibbons* v. *Ogden*, 22 U. S. (9 Wheat.) 9, 6 L. Ed. 23.

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and

selling and the transportation incidental thereto con-
stitute commerce; and the regulation of commerce in
the constitutional sense embraces the regulation at
least of such transportation. The legal definition of
the term as given by this court in *County of Mobile* v.
*Kimball,* 102 U. S. 691, 702, 26 L. Ed. 238, 241, is as
follows: "Commerce with foreign countries and among
the states strictly considered consists in intercourse
and traffic, including in these terms navigation and
the transportation and transit of persons and property,
as well as the purchase, sale, and exchange of commodi-
ties." If it be held that the term includes the regulation
of all such manufactures as are intended to be the sub-
ject of commercial transactions in the future, it is
impossible to deny that it would also include all pro-
ductive industries that contemplate the same thing. The
result would be that Congress would be invested, to the
exclusion of the states, with the power to regulate, not
only manufactures, but also agriculture, horticulture,
stock raising, domestic fisheries, mining—in short, every
branch of human industry. For is there one of them
that does not contemplate, more or less clearly, an in-
terstate or foreign market? Does not the wheat grower
of the Northwest, and the cotton planter of the South,
plant, cultivate, and harvest his crop with an eye on
the prices at Liverpool, New York, and Chicago? The
power being vested in Congress and denied to the
states, it would follow as an inevitable result that the
duty would devolve on Congress to regulate all of these
delicate, multiform, and vital interests—interests which
in their nature are, and must be, local in all the details
of their successful management. . . . .

"It is true that, notwithstanding its purposes and
ends are restricted to the jurisdictional limits of the
state of Iowa, and apply to transactions wholly internal
and between its own citizens, its effects may reach be-
yond the state by lessening the amount of intoxicating

liquors exported.  But it does not follow that, because the products of a domestic manufacture may ultimately become the subjects of interstate commerce, at the pleasure of the manufacturer, the legislation of the state respecting such manufacture is an attempted exercise of the power to regulate commerce exclusively conferred upon Congress.  . . .

" 'As has been often said, "legislation (by a state) may in a great variety of ways affect commerce and persons engaged in it, without constituting a regulation of it with'.n the meaning of the Constitution," unless, under the guise of police regulations, it 'imposes a direct burden upon interstate commerce,' or 'interferes directly with its freedom.' *Hall* v. *De Cuir*, 95 U. S. 485 (24 L. Ed., 547, citing authorities). . . .

". . . The manufacture of intoxicating liquors in a state is none the less a business within that state because the manufacturer intends, at his convenience, to export such liquors to foreign countries or to other states.  . . .

"Does the owner's state of mind in relation to the goods, that is, his intent to export them, and his partial preparation to do so, exempt them from taxation? This is the precise question for solution.  . . . There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination.  When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepôt for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed

to the common carrier for transportation out of the state.to the state of their destination, or have started on their ulimate passage to that state. Until then it is reasonable to regard them as not only within the state of their origin, but as a 'part of the general mass of property of that state, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed without any discrimnation, in the usual way and manner in which such property is taxed in the state; . . . that such goods do not cease to be a part of the general mass of property in the state, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another state, or have been started upon such transportation in a continuous route or journey." *Coe* v. *Errol,* 116 U. S. 517 (6 Sup. Ct. 475), 29 L. Ed. 715.

Another case directly in point is that of *Hammer* v. *Dagenhart,* 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1103, 3 A. L. R. 649, Ann. Cas. 1918E, 724. In this case the court held that Congress did not have authority under the commerce clause of the Constitution to pass a law to control interstate shipments of child-made goods. In the course of his opinion Mr. Justice DAY said:

"The thing intended to be accomplished by this statute is the denial of the facilities of interstate commerce to those manufacturers in the states who employ children within the prohibited ages. The act in its effect does not regulate transportation among the states, but aims to standardize the ages at which children may be employed in mining and manufacturing within the states. The goods shipped are of themselves harmless. . . . when offered for shipment, and before transportation begins, the labor of their production is over, and the mere fact that they were intended for interstate com-

merce transportation does not make their production subject to federal control under the commerce power.

"Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation. 'When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.' Mr. Justice JACKSON in *Re Green* (C. C.), 52 Fed. 113"—citing authorities.

The above two authorities from which we have so liberally quoted, and the authorities cited by them, sustain the proposition that it makes no diffeernce for what purpose the appellant operated this gin or what was his intention with reference to the cotton seed he bought from the owner; that the ginning is an entirely separate and independent and local business, and is not interstate commerce; and this law which prohibits this mill from owning the gin is in no sense a burden on interstate commerce.

The testimony for the complainant in the case shows that the appellant attempted to destroy competition by putting down the price of ginning below its actual cost This was not a violation of either secton (m), (n), or (o) of the anti-trust law as alleged. That part of the decree so finding is therefore reversed, and the fine of one hundred dollars annulled and set aside. The remainder of the decree is affirmed.

*Affirmed in part, and reversed in part.*

ETHRIDGE, J., having been of counsel, took no part in the decision of this case.